NATIONAL ZINC CO. *v.* UNITED STATES (No. 1665).[1]

1. UNDERVALUATION—PARAGRAPH I OF SECTION 3, TARIFF ACT OF 1913.

When zinc ore was entered, in accordance with the estimate on the consular invoice as being 40 per cent zinc, and the subsequent official assay showed 46.6 per cent zinc, there was no undervaluation such as would subject it to the "additional duty" provisions of paragraph I of section 3, tariff act of 1913. But when the entry stated the market value of the zinc in a ton of 40 per cent zinc ore to be less than the consular invoice showed, less than the price stated for it in the contract under which it was purchased, and less than the true market value as found by the appraiser, there was.

---

[1] Reported in T. D. 36461 (30 Treas. Dec., 952).

2. CONSTRUCTION—PARAGRAPH N, SUBSECTION 1, SECTION 4, AND PARAGRAPH I OF SECTION 3, TARIFF ACT OF 1913.

The fact that zinc ore was entered for rewarehousing to be smelted and the zinc exported does not relieve it of the additional duty incurred under paragraph I of section 3, tariff act of 1913, for undervaluation, since paragraph N, subsection 1, section 4, provides that the amount of the duties payable upon such imported ores at the time of their importation shall stand charged against the bonds of the bonded warehouses, and that the metals producible from the bonded ores or any portion thereof may be withdrawn for domestic consumption upon the payment of the duties chargeable against an equivalent amount of ores from which said metals would be producible in their condition as imported. Especially is this true in view of the provision of paragraph I, that the additional duties levied thereunder shall not be refunded "in case of exportation of the merchandise, or on any other account, nor shall they be subject to the benefit of drawback."

3. CLERICAL ERROR, MANIFEST, WHAT NOT.

An understatement of the market value per ton of zinc ore, varying from the consular invoice and from the price stated in the contract for purchasing it, the arithmetical extension in the entry being correctly made upon the basis of the declared price per ton, declared number of tons, and declared percentage of zinc content, is not manifest clerical error within the meaning of paragraph Y of section 3, tariff act of 1913.

4. CONSTRUCTION—PARAGRAPH 162, TARIFF ACT OF 1913.

The fact that paragraph 162, tariff act of 1913, provides a special method of appraising zinc ores does not relieve them from being entered upon invoice as other importations, nor does it relieve their importer from the consequences of undervaluation.

## United States Court of Customs Appeals, May 23, 1916.

APPEAL from Board of United States General Appraisers, G. A. 7823 (T. D. 35948).

[Affirmed.]

*Brooks & Brooks* (*Frederick W. Brooks, jr.*, of counsel; *James L. Gerry* on the brief) for appellants.

*Bert Hanson*, Assistant Attorney General (*John J. Mulvaney*, special attorney, of counsel), for the United States.

[Oral argument Apr. 26, 1916, by Mr. Frederick W. Brooks, jr., and Mr. Hanson.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MARTIN, Judge, delivered the opinion of the court:

The merchandise in the present case is zinc-bearing ores imported in part from Mexico and in part from Canada under the tariff act of 1913.

Such ores when imported for domestic consumption are dutiable under paragraph 162 of the act at the rate of 10 per cent ad valorem upon the zinc contained therein; when they are imported for smelting and for the reexportation of their metal content they are admitted free of duty, subject, however, to certain regulations prescribed by paragraph N, subsection 1, section 4, of the same act.

The issue now upon appeal does not relate to the assessment of primary duty upon the imported ores, but to the action of the col-

lector subjecting them to the "entered value" and "additional duty" provisions of paragraph I of section 3 of the act.

For convenient reference the three provisions of law just referred to are here copied:

162. Zinc-bearing ores of all kinds, including calamine, 10 per centum ad valorem upon the zinc contained therein: *Provided,* That on all importations of zinc-bearing ores the duties shall be estimated at the port of entry, and a bond given in double the amount of such estimated duties for the transportation of the ores by common carriers bonded for the transportation of appraised or unappraised merchandise to properly equipped sampling or smelting establishments, whether designated as bonded warehouses or otherwise. On the arrival of the ores at such establishments they shall be sampled according to commercial methods under the supervision of Government officers, who shall be stationed at such establishments, and who shall submit the samples thus obtained to a Government assayer, designated by the Secretary of the Treasury, who shall make a proper assay of the sample and report the result to the proper custom officers, and the import entries shall be liquidated thereon, except in case of ores that shall be removed to a bonded warehouse to be refined for exportation as provided by law. And the Secretary of the Treasury is authorized to make all necessary regulations to enforce the provisions of this paragraph.

Paragraph N, subsection 1, section 4: That the works of manufacturers engaged in smelting or refining, or both, of ores and crude metals, may upon the giving of satisfactory bonds be designated as bonded smelting warehouses. Ores or crude metals may be removed from the vessel or other vehicle in which imported, or from a bonded warehouse, into a bonded smelting warehouse without the payment of duties thereon and there smelted or refined, or both, together with ores or crude metals of home or foreign production: *Provided,* That the bonds shall be charged with the amount of duties payable upon such ores and crude metals at the time of their importation, and the several charges against such bonds may be canceled upon the exportation or delivery to a bonded manufacturing warehouse established under paragraph M of this section of an amount of the same kind of metal equal to the actual amount of dutiable metal producible from the smelting or refining, or both, of such ores or crude metals as determined from time to time by the Secretary of the Treasury: *And provided further,* That the said metals so producible, or any portion thereof, may be withdrawn for domestic consumption, or transferred to a bonded customs warehouse, and withdrawn therefrom, and the several charges against the bonds canceled upon the payment of the duties chargeable against an equivalent amount of ores or crude metals from which said metal would be producible in their condition as imported: *And provided further,* That on the arrival of the ores and crude metals at such establishments they shall be sampled and assayed according to commercial methods under the supervision of Government officers, to be appointed by the Secretary of the Treasury and at the expense of the manufacturer: *Provided further,* That antimonial lead produced in said establishments may be withdrawn for consumption upon the payment of the duties chargeable against it as type metal under existing law and the charges against the bonds canceled in a similar sum: *Provided further,* That all labor performed and services rendered pursuant to this section shall be under the supervision of an officer of the customs, to be appointed by the Secretary of the Treasury and at the expense of the manufacturer: *Provided further,* That all regulations for the carrying out of this section shall be prescribed by the Secretary of the Treasury.

Paragraph I of section 3: That the owner, consignee, or agent of any imported merchandise may, at the time when he shall make entry of such merchandise, but not after either the invoice or the merchandise has come under the observation of the appraiser, make such addition to the entry to or such deduction from the cost or value given in the invoice or pro forma invoice or statement in form of an invoice,

which he shall produce with his entry, as in his opinion may raise or lower the same to the actual market value or wholesale price of such merchandise at the time of exportation to the United States, in the principal markets of the country from which the same has been imported; and the collector within whose district any merchandise may be imported or entered, whether the same has been actually purchased or procured otherwise than by purchase, shall cause the actual market value or wholesale price of such merchandise to be appraised; and if the appraised value of any article of imported merchandise subject to an ad valorem duty or to a duty based upon or regulated in any manner by the value thereof shall exceed the value declared in the entry, there shall be levied, collected, and paid, in addition to the duties imposed by law on such merchandise, an additional duty of 1 per centum of the total appraised value thereof for each 1 per centum that such appraised value exceeds the value declared in the entry: * * * The duty shall not, however, be assessed in any case upon an amount less than the entered value, unless by direction of the Secretary of the Treasury * * *.

Two protests are now before the court, and these severally comprehend a large number of individual entries. The same issue, however, is raised by all of them; therefore we will take up the first entry in protest 780293, namely, 134a, in order to present in concrete form both the present question and our answer to it.

In this instance the importers received a carload of zinc-bearing ores from Canada, of which they made entry for rewarehousing at the port of Kansas City upon a consular invoice executed by their agent at the port of exportation. According to the invoice the car contained 30 tons of ore containing 2 per cent of lead, 40 per cent of zinc, and 20 ounces of silver per ton, having a total value of $12 of lead, $360 of zinc, and $130 of silver. The lead and silver of the importation were free of duty, the lead content being less than 3 per cent thereof. When the importers made entry of the ores as aforesaid they made a deduction from the value of the zinc given in the invoice in order to lower the same to its alleged market value. This was done by an indorsement upon the invoice in the following words:

Changed by importer to approximate market value, all figures being estimated. Zinc contents, 40 per cent; lead contents, not over 3 per cent. Value per Am. ton as to zinc only, $8.10. Total value, $243.

The imported ores were thereupon sampled, assayed, and appraised in accordance with the statutory provisions above copied and were found to contain 46.6 per cent of zinc instead of 40 per cent as entered and to be of the value of $15.56 per ton instead of $8.10 per ton as entered. The collector thereupon assessed so-called "additional duties" upon the importations, under the provisions of paragraph I, above copied, and the importers protested against that assessment.

Upon the foregoing statement, if taken alone, it would seem upon first impression that the protest should be sustained, since it would naturally be concluded that the undervaluation in question arose

from a discrepancy between the declared zinc content of the ores and the zinc content thereof subsequently discovered by the official assay. For it may be assumed that Congress would not have intended to penalize an importer because of a bona fide error in a statement of the zinc content of ores before the same were sampled and assayed. Therefore, if the additional duties were assessed in this case because of the fact that the importers declared the zinc content of the ores to be 40 per cent, whereas the subsequent official assay discovered 46.6 per cent of zinc therein, it would seem clear that the assessment should be set aside. A review of the record, however, discloses the fact that the additional duties in question were not assessed because of such a discrepancy but rest upon a radically different basis.

When the present merchandise was imported into this country, the importers made entry thereof upon a duly executed consular invoice, wherein it was stated that the imported ores contained 40 per cent of zinc and that the market value thereof was $360. When entering the importation the importers did not alter the invoice statement concerning the percentage of zinc in the imported ores, for this percentage is stated at the same figure in both the invoice and entry, to wit, 40 per cent. Nevertheless, the importers at entry reduced the value of the 40 per cent zinc content of the imported ores to $243, as a declaration of the alleged market value thereof; that is to say, the importers thereby declared at entry that the imported ores possessed a market value of only $243 upon the basis of 40 per cent of zinc. The reduction, it may be repeated, did not relate to the percentage of zinc in the ores but to the market value of the zinc contained in the imported ores in case they carried 40 per cent of zinc.

It may be asserted without argument that the importers were bound to enter the importations under a bona fide statement of the zinc content thereof, and this the importers apparently did in the present case. And it was equally the duty of the importers to state correctly the market value of the zinc in the imported ores in case they were found to contain the zinc content thus declared by the importers. It is certainly clear that if the present ores had assayed 40 per cent zinc the appraiser had the right to understand that the market value declared by the importers upon that basis was correct. This duty, however, the importers distinctly failed to perform, for the declarations in question seem to have been almost arbitrary in character. In the entry above selected as an example the declared value was $8.10 per ton for 40 per cent zinc ores, whereas the actual market value of that percentage of zinc was found by the appraiser to be $9.95 per ton. There was no appeal to reappraisement. The ores covered by the entry were found upon assay to contain 46.6 per cent of zinc and the market value of such a content was found by the appraiser to be $15.56 per ton, but the additional duties now

under protest were not assessed upon the difference between $8.10 per ton and $15.56 per ton, but upon the difference between $8.10 per ton and $9.95 per ton, both of which values related to the 40 per cent zinc content adopted by the importers in their declaration. This, therefore, was the discrepancy which provoked the assessment of the so-called additional duties in this case, namely, that the importers understated the market value of the zinc content of the imported ores even according to their own statement of the quantity thereof. The collector in every case conceded that the importers could do no more than make a bona fide estimate of the percentage of zinc in the ores, and that the official assay alone would reveal the true percentage; but at the same time the collector insisted that the importers should correctly state the market value of the importation per ton upon the basis of their own estimated percentage of the zinc therein. This is well stated in the language of the collector himself, appearing in his letter transmitting protest 780293 to the board:

> The entered value per ton of a given percentage of zinc should conform to the contract for zinc from that particular mine. On liquidation that entered value of a given percentage of ore is raised or lowered in conformity with the terms of that particular contract, according to the percentage of ore shown by the assay. When this appraised value of the same percentage of ore exceeds the entered value as above, additional duty was assessed.

It is contended by the importers that the market value of the imported ores could only be estimated, even though the zinc content thereof should be correctly given in the invoice. This claim, however, is not sustained by the record. It may safely be assumed that at the time of the present importations there existed a market value for the zinc in such ores if containing a 40 per cent zinc content. The appraiser found that market value to be $9.95 per ton. Furthermore, it appears without contradiction that the ores in question were consigned to the importers under a contract providing for the following price, viz, "$26 for 45 per cent when spelter is 5½ cents, with variation of 85 cents up and down for zinc and $7 spelter variation. Silver to be paid less 6 ounces at 75 per cent of New York price, and lime penalty of $1 in excess of 2 per cent fractions proportionate. This is based on freight rate of $9, any excess for your account."

It is stated, without contradiction, that this form of contract has been almost universal in the trade since zinc ores first came to be imported in considerable quantities into this country.

It thus appears that the terms of the purchase contract under which these ores were imported adjusted themselves automatically to any percentage of zinc which might be found in the imported ores. Therefore, if a given percentage of zinc content were adopted as a basis of computation the value thereof per ton could be accurately calculated by the terms of the contract alone. When the importers therefore estimated the zinc content of the ores to be 40 per cent and

named a price based upon that estimate, it was within its power to name the price which correctly corresponded with that estimate in accordance with the terms of the contract for the ores in question, and it was its duty to do this. If the ores had thereupon assayed at the same percentage of zinc as estimated by the importers the importers' declaration of value based upon that percentage would have been correct.

The foregoing statement is exemplified by the following extract from the testimony of Miss Woodruff, the customs liquidator at St. Louis, in respect to a similar entry. It may be added that the Mr. Jacobson referred to by General Appraiser Fischer is the secretary and treasurer of the appellant company.

Q. Can you tell where the discrepancy is in his figures? Will you state to the court the discrepancy in his method of figuring, of his conclusion?—A. I would like to have a specific case.

Q. Take the same one that we had, reappraisment 79580?—A. That is ore under re-warehouse bond 279, reappraisment No. 79580; it was entered under contract No. 1; under the provisions of this contract 45 per cent zinc is worth $26, with a variation of 85 cents for every unit above or below 45 per cent; it is a straight variation of 85 cents for every percentage of difference in the assay. In this case the assay was 54 per cent, and I added at the rate of 85 cents for each unit over 45 per cent; therefore I added $7.65. The spelter price was $5.50½, which was a half cent over the spelter price in the contract; and I should add at the rate of $7 per ton; so I added 3½ cents, making $33.68½; from that I deducted freight of $9, as stated in the contract, giving an appraised value of $24.68½ per ton.

Q. What was the entered value?—A. That is for 54 per cent zinc. In arriving at the entered value of 54 per cent zinc, which is the zinc which arrived, I take the entered value of $12.06 for 40 per cent zinc; to that I added 85 cents per unit for every percentage over 40; in this case it was 14 per cent, to be added at the rate of 85 cents, giving me an entered value for 54 per cent zinc of $23.96. The difference between the entered value and the appraised value on the same percentage of zinc is 73 cents, an advance of 3 per cent. I would like to ask if there is any objection to my method of arriving at the entered value of the assay percentage of zinc?

Mr. GILBERT. That is beyond me.

General Appraiser FISCHER. Mr. Jacobson admits that under that contract the method pursued by the witness is correct.

Q. (By Mr. GILBERT.) You had the contract before you all the time?—A. Yes, sir.

It may be noted that in several purchase contracts which are copied into the record the imported ores were to be paid for by the importers according to the average monthly price reported for zinc during the month of the arrival of the importations. This, however, does not affect the issue, since the importers and the appraiser are said to have agreed upon the period preceding the arrival of the ores for which the average price in the case of these importations should be taken. Otherwise the value of the zinc in the ores at the time of importation would be controlling.

The importers lay special emphasis upon the fact that the importations now in question were not intended for consumption in this country, but were entered for rewarehousing to be smelted and the zinc reexported. It is claimed that in such case it is immaterial

what value is declared upon the merchandise, since it is not to enter into the domestic markets. There is some conflict in the testimony upon this subject, however, the witness R. R. Kreeger, deputy collector, saying that the appellant company does not reexport all the zinc smelted from its imported ores and that he could not be specific upon this point concerning the present entries. But regardless of the fact concerning these identical ores, it is provided by paragraph N, *supra*, that the amount of the duties payable upon such imported ores at the time of their importation shall stand charged against the bonds of the bonded warehouses, and that the metals producible from the bonded ores or any portion thereof may be withdrawn for domestic consumption upon the payment of the duties chargeable against an equivalent amount of ores from which said metals would be producible in their condition as imported. This arrangement implies that the record of each importation shall be completed in preparation for the possible withdrawal of the metal produced therefrom for domestic consumption, and this would require a formal entry thereof as complete and correct as may be under the circumstances. It may furthermore be noted that in paragraph I, above copied, Congress has expressly provided that the "additional duties" levied thereunder shall not be refunded "in case of exportation of the merchandise or on any other account, nor shall they be subject to the benefit of drawback."

It is contended by the importers that the imposition of additional duties in such cases is contrary to the established practice of the department, and that this practice was so long-continued that the importers were justified in relying upon it as authoritative. This contention, however, is largely answered by the fact that zinc-bearing ores were not dutiable *eo nomine* under the tariff act of 1897 and appear to have been admitted free under that act under the provisions for calamine and crude minerals in paragraph 514 and 614, respectively (United States *v.* Brewster, 167 Fed., 122), and also by the additional fact that under paragraph 193 of the tariff act of 1909 zinc-bearing ores were subject to a specific and not an ad valorem duty. It need hardly be noted that the provision for the assessment of additional duties applies by its express terms to ad valorem importations only.

It is furthermore claimed by the importers that their contracts were made known to the collector at the time of the entries in question and that the discrepancies in value were therefore in the nature of mere clerical errors for which no additional duties should be imposed. In order to sustain this claim it must appear from the record that the case for additional duties arose from a *manifest* clerical error. The present record, however, does not disclose such a state of facts. United States *v.* Proctor & Co. (5 Ct. Cust. Appls., 44; T. D. 34091) and cases cited.

It is also contended for the importers that the provisions of paragraph 162 and paragraph N of section 4, *supra*, relative to the ascertainment of the zinc content of the imported ores are exclusive and relieve the importers from the duty of making an accurate or exact statement of the value of the ores at entry, since such value must necessarily depend upon the percentage of zinc in the ores, and, this percentage can not authoritatively or officially be known at the time of the entry. In answer to this, however, it should be said that although paragraph 162, *supra*, specially provides the method of appraising such importations, yet the ores must be entered upon invoice the same as other merchandise, and apparently this has been the established practice. This practice was followed by the importers in the present case. And while the importers should not be penalized for making a bona fide mistake in estimating the quantity of zinc in the imported ores, there is no excuse apparent in the record for the undervaluation of the zinc content of the imported ores upon the basis of the estimated content actually adopted by the importers themselves in the entry.

The Government in its brief questions the jurisdiction of the board and the court to hear and decide the issue raised by the importers' protest and petition upon appeal. We are of the opinion that the issues thus raised are within the jurisdiction of the board and the court, but in view of the present decision it is not necessary to enlarge upon this branch of the Government's argument.

The foregoing review of one of the entries in question sufficiently sets out the facts and principles which control in the case of all the entries now before the court. The decision of the board overruling the protests is accordingly *affirmed*.